IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


| | |
|---|---|
| ALL-CLAD METALCRAFTERS, LLC, COOKWARE MARKETING AND SALES PRACTICES LITIGATION | CIVIL DIVISION<br><br>MDL No. 2988<br><br>Case No. 21-mc-491 |

_____


Transcript of VIDEO STATUS CONFERENCE held on JUNE 23, 2021
   United States District Court, Pittsburgh, Pennsylvania
   BEFORE:  HONORABLE J. NICHOLAS RANJAN, DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiffs:            Harper Segui, Esq.
                               Rachel Lynn Soffin, Esq.
                               Martha A. Geer, Esq.
                               Millberg, Coleman, Bryson,
                               Phillips, Grossman
                               P.O. Box 1483
                               Mount Pleasant, SC 29465


For the Defendant:             Christopher J. Dalton, Esq.
                               Bridget J. Daley, Esq.
                               Buchanan, Ingersoll & Rooney
                               One Oxford Centre
                               Pittsburgh, PA 15219-1410



Court Reporter:                Karen M. Earley, RDR-CRR
                               Joseph F. Weis, Jr.
                               U.S. Courthouse
                               6260 U.S. Courthouse
                               700 Grant Street
                               Pittsburgh, PA 15219
                               412-201-2660


Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S
2      (June 23, 2021, 2:05 p.m.  In open court via
3    videoconferencing.)
4               THE DEPUTY CLERK:  Good afternoon.
5               The United States District Court for the
6    Western District of Pennsylvania is now in session.  The
7    Honorable J. Nicholas Ranjan presiding.
8               The matter now before the Court is MDL
9    No. 29-88, All-Clad Metal Crafters, LLC, Cookware
10   Marketing and Sales Practice Litigation at Case
11   No. 21-mc-491.
12               THE COURT:  Good afternoon, everyone.
13               My understanding is that everyone has already
14   entered their appearances for the record.  My
15   understanding, also, is that for the plaintiffs, the
16   primary speaker is Ms. Segui.  Am I pronouncing your
17   name correctly?
18               MS. SEGUI:  Perfectly.
19               THE COURT:  All right.  Great.  Thank you.
20               For the defendant, Mr. Dalton?
21               MR. DALTON:  Correct, Judge.
22               THE COURT:  Good afternoon to all of you.
23               That doesn't preclude anyone else from chiming
24   in and speaking at any time but I think it is helpful
25   for me to know who might be doing most of the speaking
```

1  here today.

2          So I appreciate everyone taking the time for

3  this conference.  I issued my initial order which set

4  forth a bit of an agenda for this conference.

5          I received the status report, which I really

6  appreciated receiving.  It was very helpful and I think

7  answered some of my questions.  Primarily I'm going to

8  go off my initial order and status report and tick down

9  some of the initials and open the floor.  We can

10  certainly discuss anything else that anyone believes is

11  important to raise at this time.

12          The first thing I wanted to talk about was the

13  case status.  When I received the joint status report,

14  it had indicated no additional cases had been filed.  I

15  know we have four class actions that were filed and

16  since that status report was filed a little bit ago, I

17  wanted to confirm that was still the case, that no

18  additional cases had been filed or were likely to be

19  filed or on the way.

20          Mr. Dalton, I presume you might be in the best

21  position to answer that in the first instance.  Anything

22  additional filed against your client?

23          MR. DALTON:  No, nothing new to our knowledge,

24  Judge.

25          THE COURT:  Okay.  Ms. Segui, I know your firm

 1   has filed all of these.  I assume you don't have any

 2   plans to file additional cases at this point in time; is

 3   that right?

 4            MS. SEGUI:  We do have additional clients,

 5   Your Honor, but at this time we don't have any plans to

 6   file any additional cases now that it has been MDL'd.

 7            THE COURT:  All right.  Thank you.

 8            The next item I wanted to talk about was

 9   discovery but not sort of getting into full-blown

10   discovery.  I'm sort of curious as to what, if any,

11   discovery had been done, whether formally or informally,

12   before the transfer and since the transfer and the

13   creation of the MDL.  I stayed all discovery but I did

14   mention that the parties could if they wanted to engage

15   in any kind of informal type of discovery.  So why don't

16   we go there.

17            Ms. Segui, maybe you can start in the first

18   instance.  Any discovery that has been taken in this

19   case?

20            MS. SEGUI:  Yes, Your Honor.  There has been

21   both formal and informal discovery.  There was informal

22   discovery conducted leading up to obviously under our

23   Federal Rules of Evidence 408, conducted leading up to

24   the mediation we had.

25            Then we, plaintiffs, had served formal

1  discovery requests on the defendants and their responses

2  I think were either due or coming due at the time the

3  MDL papers were filed and that had been stayed in the

4  various jurisdictions.

5        THE COURT:  Okay.  I take it no depositions or

6  anything?

7        MS. SEGUI:  No, Your Honor.

8        THE COURT:  In terms of 408 discovery, I

9  assume voluntary exchange of information to get

10 everybody on the same page for mediation?

11        MS. SEGUI:  That's correct.

12        THE COURT:  Mr. Dalton, anything to add to

13 that?

14        MR. DALTON:  No.  My colleague has got it

15 correct, fully correct.  We are in agreement there.

16        THE COURT:  All right.  Thanks.

17        I did see from the joint status report that

18 all clients had been advised to preserve evidence.

19 Sometimes in these MDLs, as you may know, there is a

20 request or an order implemented with respect to

21 preservation of evidence.  Does anyone believe that is

22 necessary in this case?  I know this is a case that has

23 been sent to the MDL but you are sort of dealing with

24 kind of a more discrete group of named plaintiffs and

25 primarily one defendant.

1                I didn't believe there was a need to issue any

2     kind of separate preservation order.  I would be glad to

3     talk about that if there is a desire by any side.

4                Ms. Segui, for the plaintiffs, do you believe

5     there is a need for any specific order?

6                MS. SEGUI:  None that I can think of right

7     now, no.

8                THE COURT:  Mr. Dalton?

9                MR. DALTON:  No.  We impressed upon our client

10    the preservation.  We did that back a year ago when this

11    case came in.

12                THE COURT:  Sounds good.  Well, I'm not going

13    to issue an order then.  Obviously the Federal Rules

14    control.  I think everyone has taken appropriate steps

15    to make sure the information, the discoverable

16    information is preserved.

17                Also on the topic of discovery, I did see from

18    the joint status report there was a confidentiality

19    agreement entered into one of the other cases that you

20    all were in the process of maybe converting to a

21    protective order here.

22                What is the status of that?  I don't know

23    whose ball the court is in.

24                MS. SEGUI:  Yes, I think that was in my court

25    to format that.  We were working on it.  My paralegal

1   had actually formatted and sent it back.  I caught some

2   references to California that we need to correct, also.

3   We really should have that over this week.

4           THE COURT:  Do you think both sides will be in

5   a position to review and confirm and file a joint motion

6   for protective order say one week from today?

7           MR. DALTON:  I should think so.  This was an

8   order that we already entered in the Northern District

9   of California.  My recollection, Judge, it's pretty

10  similar to what we do in the Third Circuit.

11          MS. SEGUI:  Yes, it's pretty straightforward

12  stuff.

13          THE COURT:  Okay.  The last thing on this

14  topic, I saw there was an ESI order that was finished or

15  close to being completed.  Do you have an update on

16  that?

17          MS. SEGUI:  Yes.  So the only issue left on

18  the ESI order, and Chris can correct me, was we had a

19  dispute over what the discovery period would be.

20          I think we can try to work through that and

21  come to an agreement.  If not, maybe that is something

22  that Special Master Katz can help us get over the finish

23  line.

24          THE COURT:  Okay.  Any views on that,

25  Mr. Dalton?

          MR. DALTON:  Ms. Segui is right.  We had one

outstanding issue that we'll talk amongst ourselves and

try to pin that down, try to work it out before we get

to the special master.

          THE COURT:  One thing I wanted to talk about

at some point today is for all of you to get in front of

the special master one way or other regardless of

depending on where we are and what the schedule is like.

It might make sense to do that sooner rather than later

and that can be just one item.  Hopefully, there is

agreement but if there is not, if you can resolve it

informally with her guidance.  I thought it might be

helpful regardless of that issue to talk discovery and

get her up to speed a little bit as well.  We can maybe

table that.  We can talk about that a little bit later

here.

          The next thing I wanted to address, though, is

mediation.  It looked like you had a pretty robust

mediation session.  Tell me about that.  What mediator

did you use?  When was it?

          Obviously, I don't need to know the numbers.

I'm somewhat curious if you all broke up at a point

where you thought whether it was a productive session

such that there might be an opportunity for follow-up or

if it was a situation where one party was playing in a

1   major league ballpark and the other was in a double AA

2   ballpark so to speak.

3          MR. DALTON:  No sports analogies, Judge.  We

4   are not supposed to do that.

5          THE COURT:  I'm not a baseball fan.

6          MR. DALTON:  Only in October.

7          MS. SEGUI:  Your Honor, we used a mediator in

8   the Northern District of California.  He was a JAMS

9   mediator, retired state court judge, but he did not have

10  a whole lot of product experience.  So from plaintiffs'

11  perspective it just didn't seem like a good fit.  I

12  think my colleagues had talked with Chris and his

13  colleagues prior to the status conference so we can get

14  on the same page about this item, this agenda item you

15  had in your CMO about potentially mediating.

16          I think, at least from plaintiffs'

17  perspective, we would be more than willing to try again.

18  I think we would probably need a reset so we can start

19  over with a clean slate.

20          I don't think we ever really had an agreement

21  on anything that was concrete or substantial.  We

22  certainly tried but I do think we would benefit from

23  maybe a different mediator who is a little bit better

24  fit for a product case like this.  That's plaintiffs'

25  perspective.

```
 1            I know they are going to say we were playing
 2   in a different ballpark.
 3            THE COURT:  More zeros.
 4            Mr. Dalton, what was your perspective?
 5            MR. DALTON:  You're right, Judge.  It's the
 6   different number of zeros after the comma but that's
 7   okay.
 8            We had two days with Judge Kramer who was
 9   formerly the complex commercial judge in San Francisco
10   County for some time.
11            We did spend a lot of time with him.  We went
12   back and forth with some various concepts but ultimately
13   weren't able to reach a compromise, obviously because we
14   are still here.
15            I personally am never adverse to try and see
16   if there is some way to work things out because the
17   worse thing you want to do is put your faith in the
18   hands of eight good and true citizens.  I think we
19   remain open to the idea.
20            I have to circle back with our folks at
21   All-Clad but I always want to keep that open.  I think
22   perhaps offline we can talk amongst ourselves about
23   possible thoughts on a different mediator.  I'm wide
24   open.
25            THE COURT:  Okay.  That sounds good.  I
```

1   appreciate the update on that.

2          Can I ask you this.  I know we'll talk about

3   this at another point probably here coming up but it

4   seemed like in the California case, there is a pending

5   motion to dismiss and motion to strike.  Sounds like

6   there might be some other ones coming down the pike in

7   terms of the other cases.

8          Is that an impediment I guess to sitting down

9   and talking settlement at this point in time?  I know

10  sometimes I like pending motions as sort of an

11  opportunity to maybe talk.  I know sometimes that can be

12  an impediment if we're talking about scheduling, and

13  they're filing motions to dismiss.

14         The question is how important is that for me

15  to sort of resolve before the parties can meaningfully

16  have additional settlement discussions?  I'll put that

17  to you, Mr. Dalton.  Maybe you don't have the answer

18  right now but it's something that sort of occurred to

19  me.

20         MR. DALTON:  No.  I hear that, Judge.  I have

21  been on both sides with my client.  Some will not talk

22  about mediation until you got a motion to dismiss

23  decided.  Some will.

24         I think the fact that we did go into mediation

25  last fall without that motion pending, I think this

1  client, if there is a reasonable opportunity to try to

2  see if we can get it resolved, we'll probably want to

3  get the motions on file obviously but may not

4  necessarily need a decision in order to get in there.

5          I need to think about it a little bit more.

6  Again, I'm amenable to try to see if we can get

7  something done.

8          THE COURT:  Okay.  I appreciate that.

9          Let's talk about the lead counsel application.

10  I received the motion for appointment of lead counsel.

11  Everything looked to be in order.

12          Ms. Segui, I don't know if there is anything

13  you want to add or elaborate on.

14          MS. SEGUI:  The only thing I would add or

15  update you on since the filing of this is that the

16  merger has been completed, so all three of us applying

17  are officially with the same firm now.  We put that in

18  the paperwork to give you a heads-up that was coming

19  down the line.

20          No, unless you have specific questions for us.

21          THE COURT:  I guess one question.  It's

22  Milberg.  Is that like a legacy spinoff from the Milberg

23  Weiss firm?

24          MS. SEGUI:  Yes.  Grossman and Phillips had

25  actually acquired Milberg in 2018 and so attached their

1   names to it.  So it was Milberg, Phillips, Grossman and

2   then three firms merged.  So it's now Milberg, Coleman,

3   Bryson, Phillips, Grossman, which I hope to never have

4   to say again so it's just still Milberg, so yes, it is

5   that same legacy firm, that's right.

6           THE COURT:  Okay.  The only question I had for

7   you and for your team I guess would be -- maybe it's a

8   couple questions.  Looking to the docket, it seems like

9   it was your firm or combination of firms and associates

10  that were really in all these cases, so there is not

11  really a competing sort of lead counsel here; is that

12  correct?

13          MS. SEGUI:  Yes, absolutely.

14          THE COURT:  In terms of how you envision -- I

15  don't think you need to get too much into the weeds but

16  how you envision your team with Ms. Geer and Ms. Soffin

17  and yourself, kind of walk me through so I have some

18  comfort as to how that division of labor, I guess, how

19  you are envisioning that just so I kind of know what the

20  respective roles are.

21          MS. SEGUI:  Sure.  I think you probably saw in

22  the leadership application that the three of us are also

23  separately co-leading other MDLs.  We thought it was

24  important to have the three of us, as you indicated,

25  have been litigating this from day one anyway.  The

1  three of us have very separate but also complimentary

2  skill sets.

3           I had taken the expert portion from the

4  beginning and run with it.  Ms. Geer can talk about

5  organization and she has a judicial background as an

6  appellant court judge.  She has a great understanding on

7  how to plot out a case from the beginning and take it

8  all the way to the end because she has seen the end

9  results.  She sees how that planning goes and they can

10  each speak to their own skill set.

11           Then Ms. Soffin has a great deal of experience

12  with product cases and experts and in particular damage

13  models.

14           We all have similar skill sets but those are

15  sort of distinguishable for us in a sense, and we do

16  work very well together.  It's a collaborative effort

17  but we also would staff the case with junior associates

18  and are very aware of not running up our lodestar.  That

19  is something we have to be very cognizant about in our

20  other MDLs, timekeeping and things like that so we're

21  not jut duplicating efforts to duplicate efforts.

22           We have a very solid strategy about how we

23  want to get this case back on track.  We all have MDL

24  experience.

25           Ms. Soffin can talk about her leadership

1   structure and her Devakruel (phonetic) MDL, which is

2   similar to what we are proposing here where here is just

3   four leads in that and there is no steering committee

4   because the case is similarly sized.

5          It would seem kind of silly almost to have a

6   steering committee in this case when it's the size and,

7   as you indicated, it's the same firm that has been

8   leading it.  That would just be unnecessarily inflating

9   our time and the people who are in a leadership role.

10         I do think it's important to have three people

11  versus two or one so you have a tie breaker in a

12  deciding vote and that is something that has been

13  problematic in some other MDLs where you have four

14  co-leads and you have two people pitted against two

15  people and who is the tie breaker in that scenario, but

16  I also think it's more important than just to have one

17  person because we need to be able to cover for each

18  other and come in where someone might not be available

19  because of their schedule or otherwise.

20         I will just give a personal example, not to

21  bring the mood down, but the personal emergency that we

22  had that we rescheduled the status conference for was

23  mine.  My dad had passed away the day before we were

24  scheduled to have this and having co-leads in other

25  cases including Ms. Soffin and Ms. Geer in this case and

1    being able to come together and cover things and put

2    things in place that even though I wanted to be here for

3    the status conference, they were still doing things

4    behind the scenes to cover for me.

5            So the proposed leadership structure ensures

6    there is coverage at the highest level but also ensures

7    we have all the complimentary skill sets for one

8    another.

9            We do have a set goal and strategy moving

10   forward where we can divide and conquer but are also

11   just not unnecessarily duplicative.

12           I would toss it to Ms. Geer and Ms. Soffin if

13   they want to add anything else.

14           THE COURT:  I appreciate that explanation.  I

15   am sorry to hear about your father as well.

16           MS. SEGUI:  Thank you.  I did want to note I

17   am very appreciative to the Court and opposing counsel

18   for helping me move the status conference because I

19   didn't want to miss it.

20           THE COURT:  Absolutely.

21           Ms. Soffin, anything to add?  That was going

22   to actually be one of my questions.  I know in a lot of

23   MDLs there is a steering committee.  I didn't see the

24   need -- I'm not sure who would be on the committee --

25   the need here.  We can all be on the committee in this

case but it seemed like if this exploded somehow into

something bigger, we can always revisit it at that point

in time.  I don't know if you had anything to add onto

that, Ms. Soffin.

MS. SOFFIN:  No, Your Honor.  Ms. Segui

covered everything.  I have had larger leadership slates

which have not been as productive.  I think the

leadership that we have proposed with Ms. Geer and

Ms. Segui and myself is exactly what this case needs.

As Ms. Segui said, we compliment each other.  We all

practice on a high level.  This requires a lot of

collaboration on that high level and we, as Ms. Segui

said have plenty of junior associates that can help us

with things that don't require such a high level skill

set.  We believe this would be adequately staffed with

the three of us.

THE COURT:  Ms. Geer, I don't know if you

would like to add anything.

MS. GEER:  Your Honor, I think they certainly

covered it.  I think as both Ms. Segui and Ms. Soffin

have said, our strengths vary and compliment each other.

My background is such that I have a better

sense than most practitioners of what is maybe most

helpful to a judge with respect to briefing and argument

and presenting the issues, and I also as a result of my

1  background have a great deal of experience in managing

2  matters with a very lean staff.

3       So I think that lends itself to being able to

4  ensure that we represent the class as effectively as

5  possible but also that we're not, as Ms. Segui said, we

6  are not focusing on running up the lodestar but

7  presenting the case and the issues well with the least

8  amount of duplication of effort.

9       We also wanted to make sure this structure

10 does not have the traditional liaison counsel but we

11 will ensure that role is fulfilled.  Because of our

12 experience litigating nationwide, we are accustomed to

13 ensuring that we are in compliance with the local rules

14 and judge's preferences and we'll make sure to do that

15 in this case as well.

16       THE COURT:  All right.  Thank you.

17       Just the final question I had was and you

18 might have covered it, is there one particular person

19 that would be on point for things like settlement and

20 mediation and that sort of thing?

21       MS. SEGUI:  Honestly, I think all three of us.

22 We were in attendance at mediation and we definitely

23 bring different aspects to the table with regard to

24 settlement, also, just from different experience level.

25       I'm not sure we need necessarily a point

1  person because I think we would all want to be pretty

2  heavily involved.  If you needed a liaison to take the

3  lead, though, I'm happy to fill that role.

4           THE COURT:  Okay.  I didn't find there was a

5  need for a liaison.  In some MDLs, there is a liaison on

6  both sides.

7           I know, Mr. Dalton, your firm obviously has a

8  Pittsburgh office here and what I might consider doing

9  or suggesting maybe to the group is to the extent that

10  there is a need for some type of administrative liaison

11  role, maybe it's somebody at Buchanan locally that can

12  sort of coordinate in more administrative matters on

13  behalf of all sides.

14           I don't know, Mr. Dalton, if you have somebody

15  that is willing to do that or already on the docket?

16           MR. DALTON:  Administratively handling things?

17           THE COURT:  Yes.

18           MR. DALTON:  I'm looking at the square below

19  me.  My colleague Bridget Daley is in our Pittsburgh

20  office.  I don't know if she would be.  She is our boots

21  on the ground.

22           THE COURT:  Okay.  Ms. Daley, I won't do a

23  formal appointment of liaison counsel but maybe less

24  formally to the extent there is a need it becomes

25  something where there is a need to engage in some more

1    administrative oversight for whether it's scheduling or

2    court proceedings or what have you, if you can put that

3    on your to-do list to sort of shepherd that, I would

4    appreciate it.

5           MR. DALTON:  I will apologize for throwing

6    Bridget under the proverbial bus.

7           THE COURT:  Sounds good.  I will grant

8    that -- well, I should ask, Mr. Dalton, I presume the

9    defendant has no objection to the motion?

10          MR. DALTON:  No.  We have been working well

11   for a year now, so no objection.

12          THE COURT:  Thank you.  I'll grant that motion

13   and the follow-up order to this and appoint the proposed

14   lead team as has been proposed.

15          Let's talk about the motions to dismiss.  I

16   know from the joint status report, as I mentioned, it

17   looked like there were some additional motions that were

18   going to be filed or even in the original Judeo

19   (phonetic) case may be refiled.

20          Mr. Dalton, do you envision filing motions to

21   dismiss in all those cases?

22          MR. DALTON:  We do have a motion pending in

23   the Massachusetts case that was transferred.  I believe

24   that is fully briefed.  We have planned to file a motion

25   to dismiss in the Northern District case.  I don't

 1    believe we got that on file yet.  We have the two other

 2    cases in which we hadn't responded yet, the Georgia and

 3    Florida case.

 4           So, yes, we were intending to test the

 5    pleadings in those two cases.

 6           THE COURT:  Do you have sort of a timeline?  I

 7    think in the joint status report one of the things you

 8    all said you would raise with me is a briefing schedule

 9    of some kind.

10           MR. DALTON:  Yes.  To be quite honest, that

11    one hasn't got on my agenda yet but I can certainly talk

12    with my co-counsel, co-defense counsel and try to figure

13    out to map out strategies and timeframe and perhaps that

14    might be something when we put in the joint discovery

15    plan for the Rule 16 conference, maybe that would be

16    something we propose in that.

17           THE COURT:  Yes.

18           MR. DALTON:  I throw that out to the Court and

19    Ms. Segui.

20           THE COURT:  Ms. Segui, any reaction to that?

21           MS. SEGUI:  That's fine.  We had previously

22    spoken to Mr. Dalton about just briefing schedules and

23    the other and had proposed 30 days for a response and 15

24    days for a reply.  So we would just try to keep those

25    timeframes in mind again but other than that, that makes

1    sense to me.

2              MR. DALTON:  If those timeframes are good with

3    the Court, they are probably good with me.  I just have

4    to figure out when that first date is going to fall.

5              THE COURT:  When you write the first brief,

6    yes, that's the tricky part.  Okay.  That's fine with

7    me.

8              Let me think about it a little bit.  This

9    might segue into what I wanted to talk about with

10   respect to the schedule kind of going forward, including

11   the Rule 16 conference and discovery.

12             To me I usually won't stay discovery in light

13   of a pending motion to dismiss.  I don't think it makes

14   sense in this case to do so.  I think it probably makes

15   sense to start you all on sort of a path to discovery.

16             You already started it.  Even though it's an

17   MDL and sort of a bigger class action, I got to think

18   for purposes of getting to the nub of the key discovery

19   and mediation purposes, it's not going to be so

20   voluminous I would hope or I would think that there is a

21   huge efficiency gained by pushing off all discovery

22   until resolution of motions to dismiss.

23             Sort of coming in my plan was we do one of

24   these conferences relatively quickly.  In advance of

25   that, you all could provide a discovery plan which would

1    scope out also the motion to dismiss, briefing schedule,

2    and then we can sort of start you on discovery, start

3    you with the special master, and then I would take up

4    the motions to dismiss as quickly as I can so that there

5    would be some -- in the event I dismiss the whole case,

6    obviously there would be some efficiency gained.

7         I was a little concerned pushing discovery way

8    off to resolve some of these motions, including if they

9    were potentially partial motions that wouldn't entirely

10   dispose of all the claims.  I don't know if that's the

11   case or not but I'm willing to talk about that.

12        Mr. Dalton, any reaction to that?

13        MR. DALTON:  Well, the motions themselves

14   would be addressed entirely.  It would be entirely

15   dispositive.  That would be our intent to try to make

16   them entirely dispositive.

17        I'm going to be the rational lawyer to say,

18   Judge, I understand your position.  Obviously my client

19   would certainly prefer to have decisions made before

20   engaging in discovery but at the same time, I understand

21   the Court's desire to get the case moving as well.

22        THE COURT:  I'm open to suggestions from both

23   sides, too, on it.

24        Even from the plaintiffs' perspective, you

25   don't want to waste a lot of time and energy to find

1    dismissing a whole case.

2          Another option is taking some kind of more

3    narrow upfront discovery before we sort of open it up to

4    broader discovery and that might be a little bit more

5    proportional.  There's some other options there as well.

6          Ms. Segui, I don't know if you have a take on

7    it.

8          MS. SEGUI:  From our perspective, this case is

9    over a year old and we really want to get moving.

10          Something I would love to re-explore with

11   Mr. Dalton and his colleagues is doing a discovery

12   coordination plan so we're discussing serving a master

13   set of discovery, discussing certain limitations and

14   things like that so that we're not duplicating efforts

15   there.

16          So I would like to get that kind of thing in

17   place.  We would certainly love to start sending

18   subpoenas off to authorized retailers and places like

19   that.

20          My initial reaction to doing a more narrowed

21   approach on the front end is that I have the

22   Blackbod (phonetic) MDL that I'm co-leading right now

23   which is in some intense phased discovery and it's

24   causing some issues about what is included.  It's the

25   typical kind of like almost a similar bifurcation kind

1    of argument where you end up getting into trouble with

2    what should be included and what shouldn't be included.

3    I think sometimes that can create some issues but, yes,

4    that's just sort of my reaction to that.

5          I would love to just get the discovery plan in

6    place and let's start moving.  The optimist and the

7    plaintiffs' attorney believes the case will not be

8    dismissed in its entirety, so that's where we are coming

9    from there.

10          THE COURT:  Okay.  I can sort of tend to agree

11   with you with respect to formal bifurcation or phasing.

12   I loved that as a lawyer and I loved it as a judge.  It

13   creates so many headaches and usually the lawyers come

14   back jointly later saying we don't want the bifurcation

15   anymore because of all the headaches it causes.

16          Maybe the thing to talk about and when you

17   sort of work through a proposed discovery plan isn't so

18   much a bifurcation but this just goes to

19   proportionality, and I think logically it is going to

20   make sense to try to maybe prioritize some of the less

21   burdensome and less costly discovery like the subpoenas.

22   I think you have to get those out, otherwise -- both

23   sides I think would need to get those out to get your

24   arms around class size, right?  I presume All-Clad sells

25   direct but primarily also through retailers and so it

```
 1    seems like you'll need to get records of purchases and
 2    that sort of thing even to be able to intelligently
 3    assess exposure and settlement value.
 4             So things like subpoenas and documents that
 5    would be covered by initial disclosures.  I presume you
 6    both have experts, maybe All-Clad has somebody internal,
 7    that is looking at the products and working up the
 8    products.  That sort of thing should probably be front
 9    loaded as well, maybe pushing off some of the
10    depositions a little bit in the schedule until I can get
11    through, you all can get through the briefing and the
12    motion to dismiss and I can make a decision on it.
13             Does that sort of make sense at a high
14    conceptual level?
15             MS. SEGUI:  Yes, that makes perfect sense to
16    me.  Actually, I was thinking prioritization and then
17    you said it.  I was happy that you said that.  That
18    makes total sense.
19             That is also something Mr. Dalton and our
20    colleagues can discuss and probably reach an agreement
21    about what is the priority and those necessary items and
22    also those things might help us push towards potentially
23    mediating again.
24             THE COURT:  Okay.  Mr. Dalton, any views on
25    this?
```

1          MR. DALTON:  From a very high level

2   perspective, I think that's fine like you discussed, to

3   get into the details obviously.

4          THE COURT:  What I think I might do then in

5   terms of next steps is after this conference have you

6   all sort of meet and confer, maybe come up with like a

7   discovery plan that would also include a Rule 12

8   briefing schedule component to it and then in light of

9   kind of how the briefing schedule is structured, maybe

10  you can propose some sort of a discovery horizon.  It

11  wouldn't be formal phases but maybe kind of tentative

12  plans as to what over the next three months we sort of

13  plan on doing X and then the following three months Y.

14          I wouldn't necessarily hold you all to that if

15  there is a need to do a critical deposition earlier than

16  whatever, phase two or three, but at least everyone is

17  on the same page as to how the case can proceed in an

18  orderly way and be mindful of cost.

19          I think it probably makes sense to sit down

20  and confer and kind of come up with that plan and then

21  have a sit down or a virtual sit down with Carole Katz

22  to get her on the same page to the extent some of that

23  overlaps with production of ESI and the ESI order and

24  when you work through that, submit a proposal to me.

25          What we can do is either do another Rule 16

1   conference at that point in time or if you want to add

2   this to whatever submission you make, that you don't

3   think it's necessary and sort of clear from that, I'm

4   fine if I understand just authorizing it and then

5   allowing you to go sort of off to the races on that.

6           Any question on that plan, Ms. Segui?

7           MS. SEGUI:  No.  That sounds great.

8           THE COURT:  Mr. Dalton?

9           MR. DALTON:  That's fully clear, yep.

10          THE COURT:  Okay.  In terms of mediation, I do

11  think it makes sense to go through another mediation,

12  probably with another mediator and it may be something

13  that -- I think it should be earlier rather than later

14  but maybe not too early here.

15          I don't know how your discussions were before

16  but maybe it was more back of the envelope in terms of

17  sort of class size and that sort of thing but it might

18  make sense to take some of that initial discovery, maybe

19  get into about three months or so to get a better sense

20  and handle on class size and exposure and that sort of

21  thing, then revisit mediation.

22          I'm not opposed if you think you are ready to

23  go sooner to that option as well, but I don't know from

24  your prior experience whether you all had enough

25  information.  Maybe you didn't even get to that point.

1   Maybe you were just talking structures and not numbers

2   but I'm open to hearing your thoughts or you think you

3   are prepared -- I know you did some exchange of

4   information before.  If you're prepared right away to go

5   to mediation or you think it might make sense to do some

6   additional discovery and find a date a few months from

7   now?

8           MS. SEGUI:  We did get a good bit of

9   information through our prior exchange.  There is

10  probably some stuff that would be good to update and

11  maybe hash through on the back end with some additional

12  discussions with Mr. Dalton and his team ahead of time

13  and also continue to proceed with litigation and

14  discovery on a dual track.

15          I do know that because no one is still really

16  traveling all that much for mediations, it's actually

17  harder to get dates these days because everybody is able

18  to get on Zoom.  That's great for traveling purposes but

19  it's harder for mediators.

20          Maybe if we can reach an agreement on a

21  different mediator and try like a September-October kind

22  of timeline and that way we can continue to get

23  discovery done, including updating where we were last

24  fall, I think that's a good plan.

25          THE COURT:  Okay.  Mr. Dalton, any reaction to

1    that?

2             MR. DALTON:  I think it's a good idea to try

3    to see if we can get this resolved one way or another.

4    I'm happy to talk to our team about getting some

5    additional names of any potential other mediators.  It's

6    always nice to add another mediator to our list in

7    pocket.

8             THE COURT:  Absolutely.  Sounds good.

9             Why don't we do this.  As part of the order

10   after this hearing, I'll have you do sort of the

11   discovery plan, set up a meeting with Carole Katz and

12   then whatever proposal you provide to me, proposed

13   order, kind of get your ducks in a row, sort of talk

14   about a mediator, maybe schedule a date and put it in

15   there so it's all scheduled and on track.

16             I will say this.  At least the mediators here,

17   many of them are doing Zoom mediations and actually have

18   vowed never to go back to doing them in person.

19             I was playing golf with a mediator the other

20   day and he said he is never going to do another

21   in-person mediation.  He doesn't have to travel anymore.

22   Then for client reps, it's great.  They don't have to

23   travel and it actually makes the logistics a lot easier.

24             From my settlement conferences that I have

25   done, I found them to be pretty effective.  I have heard

1  sort of some folks having negative experiences, so it

2  may depend on the case or the mediator, but hopefully,

3  they may make it a little bit easier to coordinate,

4  especially since everybody is sort of in different

5  locations and depending on the mediator, that person

6  might be in a different location as well.

7          I should note, too, under our local rules, you

8  are not tied to using a mediator that is on our local

9  list.  You certainly can.  I'm not sure any come to

10  mind.  I will have to give it some thought.  It might be

11  something you talk to Carole Katz about, who is one of

12  our more prominent mediators here who she might know

13  somebody or recommend somebody who is a real products

14  mediator.  I know I have used and referred cases to --

15  you all might, especially Mr. Dalton, you might have

16  used him out sort of your way, Jed Melnick.  He's a

17  JAMS.  I think he is out of Philadelphia.

18          MR. DALTON:  Yes, very familiar name.

19          THE COURT:  I like him.  I think he has done

20  some products cases, a lot of security cases, but I

21  always liked him as a lawyer and as a judge because he

22  is sort of creative and smart.  I drop his name.  Don't

23  feel pressure to use him.  I don't know of the product

24  experience, you might need somebody with more products,

25  who would understand that as well.

1            So the last thing I wanted to note on my list

2    and I'll certainly open it up for anything anyone else

3    wants to raise or anyone thinks I have forgotten, is

4    just sort of my general practices and procedures.

5            I think you saw from my initial order that

6    obviously we put a premium on collegiality.  I don't

7    think that is going to be an issue.  I can already sense

8    you have all worked together very well.

9            We have a special master in place here in this

10   case where I think she is a real problem solver so if

11   any discovery disputes come up, you might want to see if

12   she will engage in more of an informal resolution

13   process as opposed to a lot of motions practices.  I

14   think she will be a good asset to all of you.

15           That's some of sort of the quirks in terms of

16   class actions.  To the extent this case, if it's helpful

17   to tell you right upfront thinking about it the whole

18   time, so to the extent this case gets to a class-wide

19   settlement stage, I like to really scrutinize the

20   fairness of the class settlement at the preliminary

21   approval stage as opposed to the final fairness stage.

22   I think at that point the ship has sailed a little bit

23   and there are a lot of sunk costs if you sort of undue a

24   settlement.

25           So give it some thought when you do your

1  preliminary approval papers and I might want to even

2  hold a more formal hearing such that in my view, the

3  fairness hearing, that is more kind of like a rubber

4  stamp because I will hopefully have really vetted any

5  class-wide settlement at the preliminary approval

6  hearing and maybe I'm just looking at things like

7  opt-outs and claims rates and that sort of thing at the

8  final stage.

9         The other thing, too, to think about as you

10 try to settle the case, to the extent you get to that

11 point and mediate the case, I also really try to

12 scrutinize things like attorney fees and how attorney

13 fees are allocated.  Obviously that's an important

14 consideration.  So give it a thought as to how you want

15 to mediate the case and how you engage in settlement

16 discussions.

17        So, for example, to me like the cleanest way

18 to do it, and I know it's not practical oftentimes,

19 especially from the defense side, is to sort of agree in

20 principal on a settlement amount and defer fees for a

21 separate settlement discussion and negotiation such that

22 there is no sort of ethical issues involved.

23        I note that what you could even do is

24 structure a settlement such that the fees component --

25 you'll agree to the settlement, agree in good faith to

1   negotiate the fees separately and if there is a dispute

2   on that, agree to just send it to the Court.

3            I'm not necessarily advocating that but that's

4   a good, clean way where you won't get into some more

5   ethical land mines.

6            Regardless of that, however you do that, keep

7   that in mind that I will pay close attention to that.

8            The other thing both with respect to motions

9   for class certification as well as approval of a

10  class-wide settlement, I really look closely to

11  involvement of the named plaintiffs.  I think the named

12  plaintiffs obviously are important for adequacy purposes

13  but even more so for settlement purposes, I would expect

14  that there would be as part of any kind of settlement or

15  request for incentive awards or incentive fees.  I would

16  probably want to talk to the named plaintiffs before I

17  authorize -- talk to them in the context of a hearing,

18  of course, before I authorize incentive awards to make

19  sure that they're sort of on top of really managing the

20  case as I believe a named plaintiff should do so.

21           That means in my mind, at least, more of an

22  active role.  It doesn't necessarily mean in the weeds

23  but I want somebody that knows what is going on, is in

24  frequent communication with counsel and is at major

25  court appearances, if able, like a remote appearance or

1   even by phone if travel is an issue.

2           So I will look at things like that before I

3   authorize or approve any kind of incentive award.  I may

4   look at things like that with respect to adequacy of the

5   class representative.

6           I want to throw those out there so you all

7   know now from day one what is important to me and

8   hopefully can take that into account as you sort of

9   progress in terms of litigating or trying to mediate

10  this case.

11          That's everything I think on my list.  Are

12  there any questions or anything that I have missed or we

13  should discuss?  Ms. Segui, from the plaintiffs'

14  perspective, anything?

15          MS. SEGUI:  No, Your Honor.

16          THE COURT:  Mr. Dalton, anything?

17          MR. DALTON:  I think that's all of it, Judge,

18  yes.

19          THE COURT:  Great.  Thank you.  I'll get an

20  order out kind of memorializing everything we talked

21  about next steps and we'll go from there.

22          Since everybody is sort of remote, to the

23  extent we have conferences, I'm fine doing these by

24  Zoom.  I would like to see some folks in person one day,

25  so we might have a couple of these in person but if

1  there are issues with travel or anything, let me know

2  and we can certainly have some minor conferences as Zoom

3  conferences.

4          With that, I appreciate everybody here today.

5  Take care and have a good day.

6          MS. SEGUI:  Thank you, Your Honor.

7          MR. DALTON:  Thanks, counsel.

8          (Whereupon, the above hearing concluded at

9  3:00 p.m.)

10                - - -

11

12         I hereby certify by my original signature

13  herein, that the foregoing is a correct transcript, to

14  the best of my ability, from the record of proceedings

15  in the above-entitled matter.

16

17

18         S/ Karen M. Earley

19           Karen M. Earley

20           Certified Realtime Reporter

21

22

23

24

25